THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| KIRSTEN W., individually and on behalf of C.W. a minor,<br><br>             Plaintiff,<br><br>vs.<br><br>CALIFORNIA PHYSICIANS' SERVICE d/b/a BLUE SHIELD of CALIFORNIA, and the TRINET GROUP, INC. SECTION 125, SECTION 129, and FLEXIBLE SPENDING ACCOUNT PLAN<br><br>             Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [118] [119] PLAINTIFF AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING [122] PLAINTIFF'S MOTION TO EXCLUDE EXPERT OPINIONS AND TESTIMONY**<br><br>Case Number 2:19-cv-00710-DBB-JCB<br><br>District Judge David Barlow<br><br>Magistrate Judge Jared C. Bennett |

Before the court are the parties' cross-motions for summary judgment,[1] and Plaintiff's

motion to exclude the expert report and opinions of Defendants' expert, Dr. Caitlin R. Costello,

M.D. ("Dr. Costello").[2] Plaintiff Kirsten W., individually and on behalf of her son, C.W.,[3] sued

Defendants California Physicians' Service d/b/a Blue Shield of California ("BSC") and the

Trinet Group, Inc. Section 125, Section 129, and Flexible Spending Account Plan ("Trinet")

under the Employee Retirement Income Security Act of 1974 ("ERISA") and the Mental Health

Parity and Addiction Equity Act of 2008 (the "Parity Act" or "MHPAEA").[4] For the reasons

---

[1] Defs.' Mot. Summ. J. ("Defs.' MSJ"), ECF No. 119, filed August 2, 2024; Pl.'s Mot. Summ. J. ("Pl.'s MSJ"), ECF No. 118, filed August 2, 2024.
[2] Pl.'s Mot. to Exclude Costello, ECF No. 122, filed on August 2, 2024.
[3] On April 13, 2024, C.W. passed away. Stipulated Notice of Death, ECF No. 141, filed on October 22, 2024.
[4] Second Am. Compl. ("SAC"), ECF No. 88, filed February 17, 2023.

below, the court grants in part and denies in part the parties' motions for summary judgment and denies Plaintiff's motion to exclude Dr. Costello.

## BACKGROUND

### *Plan Structure, Coverage, and Level of Care Guidelines*

Plaintiff participated in an employee welfare group health insurance plan ("the Plan") governed by ERISA.[5] As a dependent of Plaintiff, C.W. was a beneficiary under the Plan.[6] BSC is the Claims Administrator for the Plan and had the discretion to interpret plan terms and determine coverage.[7] The Plan covers treatment for varying levels of outpatient and inpatient mental health and substance abuse services.[8] Outpatient care is the least restrictive and applies when the beneficiary is not confined in a hospital. Outpatient care includes partial hospitalization services, which provides "services at least five hours per day, four days per week," as well as intensive outpatient programs ("IOP"), which provides services "at least three hours per day, three days per week."[9] On the other hand, inpatient mental health treatment is the most restrictive and covers services that are provided by a hospital when a beneficiary is confined in a hospital for treatment and evaluation of mental health and/or substance abuse. Residential Care—a less restrictive level of inpatient care—is "provided in a facility or a free-standing residential treatment center that provides overnight/extended-stay services for Members who do not require acute inpatient care."[10]

---

[5] SAC ¶ 4; Answer ¶ 4, ECF No. 105, filed August 4, 2023.
[6] *Id.*
[7] Administrative Record ("Rec.") 67–68, ECF No. 130, filed on August 9, 2024.
[8] Rec. 15, 43–44, 540–41.
[9] Rec. 44.
[10] Rec. 79.

Under the Plan, benefits are covered if BSC determines them to be Medically Necessary.[11] The Plan defines Medically Necessary services as: "only those [services] which have been established as safe and effective, are furnished under generally accepted professional standards to treat illness, injury or medical condition, and which, as determined by Blue Shield, are" "consistent with Blue Shield medical policy"; "consistent with the symptoms or diagnosis"; "not furnished primarily for the convenience of the patient, the attending Physician or other provider"; and "furnished at the most appropriate level which can be provided safely and effectively to the patient."[12]

To evaluate coverage of Residential Treatment Center ("RTC") level of treatment for children and adolescents, BSC has relied on various different criteria that were in effect during different periods. Of particular relevance, BSC utilized the 2018 MCG 21st Edition Residential Acute Behavioral Health Level of Care Guidelines ("MCG Guidelines")[13] and Version 20 of The Child and Adolescent Level of Care Utilization System Guidelines ("CALOCUS"). Under the MCG Guidelines, "admission to a residential acute level of care for a child or adolescent is indicated due to all of the following:"

> I. Patient risk or severity of behavioral health disorder is appropriate to proposed level of care as indicated by 1 or more of the following:
>
> > A. Danger to self for child or adolescent
> >
> > B. Danger to others for child or adolescent
> >
> > C. Behavioral disorder is present and appropriate for residential care with all of the following:

---

[11] Rec. 56, 76–77, 138.

[12] Rec. 76–77, 159–60.

[13] The MCG Guidelines were in effect during the applicable RTC treatment period. During the appeal process, the 25th edition of the MCG guidelines came into effect. BSC mentions both of these guidelines in multiple denial letters. Because there is minimal difference between the two versions of the guidelines as relevant to the issues of this case, the court solely lists the criteria relevant to the 21st edition.

- Moderately severe psychiatric, behavioral, or other comorbid conditions for child or adolescent

- Serious dysfunction in daily living for child or adolescent

II. Treatment services at proposed level of care are indicated due to presence of 1 or more of the following:

A. Specific condition related to admission diagnosis is present which is judged likely to further improve at proposed level of care.

B. Specific condition related to admission diagnosis is present and judged likely to deteriorate (e.g., admission to higher level of care may be precipitated) in absence of treatment at proposed level of care.

C. Patient is receiving continuing care (e.g., transfer of patient whose condition stabilized at higher level of care or has care needs that cannot be met at less intensive level of care) and services available at proposed level of care are necessary.

III. Situation and expectations are appropriate for residential care for child or adolescent as indicated by all of the following:

A. Recommended treatment is necessary, appropriate, and not feasible at lower level of care (e.g., less intensive level is unavailable or not suitable for patient condition or history).

B. Very short-term crisis intervention and resource planning for further care at nonresidential level is unavailable or inappropriate.

C. Patient is willing to participate (or agrees to participate at direction of parent or guardian or attend due to court order) in treatment within highly structured setting voluntarily.

D. There is no anticipated need for physical restraint, seclusion, or other involuntary control (e.g., patient not actively violent).

E. There is no need for around-the-clock medical or nursing care.

F. Patient has sufficient ability to respond as planned to individual and group therapeutic interventions.

G. Biopsychosocial stressors have been assessed and are absent or manageable at proposed level of care (e.g., any identified deficits can be managed by program directly or through alternative arrangements)."[14]

---

[14] Rec. 2661.

On the other hand, CALOCUS examines and scores six "dimensions" to determine the appropriate level of care, including (i) risk of harm; (ii) functional status; (iii) co-morbidity; (iv) recovery "environmental stress" or "environmental support;" (v) resiliency and treatment history; and (vi) acceptance and engagement.[15] A composite score of 23 or above indicates a need for residential mental health treatment.[16] If a beneficiary disagrees with an initial coverage determination, the Plan provides an internal appeal process. If the beneficiary's claim is again denied, the beneficiary may bring legal action.[17]

*Admission and Care at Open Sky*

On December 15, 2017, Plaintiff admitted C.W. to Open Sky Wilderness Therapy ("Open Sky") for treatment of his mental health issues and substance use.[18] According to Plaintiff, C.W. began exhibiting symptoms of depression, low energy, irritability, substance use, behavioral problems, anger, defiance, and oppositionality approximately nine months earlier, partly due to starting 9th grade at a new school.[19] Additionally, on December 19, 2017, C.W. reported that he had suicidal thoughts without a plan or attempt when staying at a hotel shortly before his admission to Open Sky.[20] He did not feel suicidal as of the date of that report.[21] Mr. Jonathan Mitchell, MA, LPC ("Mr. Mitchell"), C.W.'s therapist at Open Sky, listed two "diagnoses" in the Treatment Plan for which to focus on over the course of C.W.'s treatment: (i) adjustment

---

[15] Rec. 4227.
[16] Rec. 4227.
[17] Rec. 730.
[18] Rec. 355, 421, 426, 437.
[19] Rec. 421.
[20] Rec. 440.
[21] Rec. 440.

disorder with mixed disturbance of emotions and conduct; and (ii) parent-child relational problem.[22]

Within two weeks of C.W.'s admission, it appeared that C.W. was not engaging in his treatment in any way other than ways that will keep him from "getting in trouble."[23] He believed strongly that he did not need to be at Open Sky.[24] On January 16, 2018, Kevin Gonzalez Boas, PhD ("Dr. Boas") conducted a Psychological Evaluation Report of C.W.[25] C.W. mentioned during the interview that seeing a therapist prior to wilderness was "beneficial" but expressed that he was unable to "make any real progress due to the fact that [he] was sent [to Open Sky] before [his] 3rd session."[26]

During the interview, Dr. Boas administered multiple tests, including the Minnesota Multiphasic Personality Inventory – Adolescent Version (MMPI-A), which is an objective personality test that measures a variety of personality dynamics and mental health issues by comparing response patterns to normative data.[27] Although C.W. "responded to this test in a defended manner," Dr. Boas opined that the results could still be interpreted as valid and formed the following hypotheses:

> [C.W.'s] clinical profile suggest[s] difficulties with disinhibition and authority which manifest in immature, impulsive, oppositional, and hedonistic tendencies. Since he likely spends time with friends that get in trouble and he has difficulty learning from consequences, [C.W.] is often in trouble and shows little remorse/accountability for his misbehavior. Problems in school and at home are common. In addition, findings from the MMPI-A indicate that he struggles with

---

[22] Rec. 437. A January 16, 2018 Psychological Evaluation Report listed C.W.'s diagnoses as "Attention Deficit Hyperactivity Disorder, Predominantly Inattentive Pre-sensation," "Persistent Depressive Disorder (dysthymia)," and "Parent-Child Relational Problem." Rec. 422. It also noted "features of oppositional/defiant traits." *Id.*

[23] Rec. 355.

[24] Rec. 355.

[25] Rec. 396.

[26] Rec. 398.

[27] Rec. 410.

> impulsivity, low frustration tolerance, and emotional avoidance. He is thus at a greater risk for engaging in risk-taking and sensation-seeking behaviors, including, but not limited to, being at risk for a higher incidence of use and abuse of drugs and alcohol.
>
> Emotionally, [C.W.] endorsed symptoms of anxiety and depression, Additionally, relationships are likely strained as he is hedonistic, resentful, and untrustworthy even if he makes a good first impression. He reports being irritable and impatient with others, and he may throw temper tantrums to get his way. Feeling distant from others, he feels disliked and believes that no one understands him. It is likely that [C.W.] uses acting out as a primary defense mechanism (albeit unconsciously), which allows him to deflect the focus from more pressing core issues (which are uncomfortable for him to discuss), and place the focus rather on the disruptive behaviors (which is much more tolerable for him to manage).[28]

The report also indicated that C.W. has difficulty managing conflict, a "very high potential" to develop alcohol or drug problems, a strong tendency to avoid problems, and an unwillingness to address significant problems in his life.[29]

Dr. Boas also administered the Beck Depression Inventory – Second Edition (BDI-II) exam, which measures the severity of depression over the prior two weeks.[30] The test indicated that C.W. was experiencing "mild clinically significant depression" at the time.[31] This was primarily based on C.W. endorsing on the test: "I feel sad much of the time; I am more critical of myself than I used to be; I feel guilty over many things I have done or should have done; and, I have thoughts of killing myself, but I would not carry them out."[32]

Dr. Boas made several conclusions following C.W.'s evaluation:

> The results of this evaluation suggests that [C.W.] has difficulties managing his emotions effectively, has a low frustration tolerance, is emotionally reactive, is a strong internalizer, and has been experiencing symptoms of depression and anger. The results of this evaluation also finds that [C.W.] has a very strong tendency to

---

[28] Rec. 410–11.
[29] Rec. 411.
[30] Rec. 413.
[31] Rec. 413.
[32] Rec. 413.

deny problems, take accountability, and likely blames others for the problems in his life. [C.W.] has also begun using substances and he identifies that marijuana helps him have a 'different experience' in which he is able to 'have fun and sure around.' Although his mood has improved significantly since he has been in the wilderness, [C.W.] is still reporting some symptoms of depression.

In addition, [C.W.]'s overall clinical presentation is complicated by the fact that it also includes symptoms of ADHD and processing deficits. As such, it is likely that [C.W.] often gets stuck in a rigid or irrational thought process, which is often associated with ADHD (as well as depression).[33]

Finally, Dr. Boas opined that C.W. "lacks the emotional resources needed to return to his home environment and requires the support that can be offered by a live-in academic environment where he can receive ample structured social and therapeutic support and prosocial opportunities facilitated by appropriately trained staff."[34]

On March 28, 2018, C.W. was discharged from Open Sky.[35] In the Discharge Summary, Mr. Mitchell (C.W.'s therapist) noted that C.W. "seemed to struggle to follow basic program expectations . . . but gain[ed] significant insight into why he acted the ways he did."[36] Mr. Mitchell concluded that C.W.'s treatment symptoms were reduced but recommended that he attend a RTC "to support continued growth and success," in addition to participating in weekly individual and family therapy.[37]

*Admission and Care at Telos Residential Treatment, LLC*

On March 29, 2018, C.W. was admitted to Telos Residential Treatment, LLC ("Telos").[38] However, C.W. did not start treatment until April 1, 2018 because he ran away from the facility,

---

[33] Rec. 421.
[34] Rec. 423.
[35] Rec. 426.
[36] Rec. 427.
[37] Rec. 428, 431.
[38] Rec. 2600.

taking an Uber ride to Los Angeles to meet up with his friends, where he drank alcohol, smoked marijuana, and used MDMA.[39] On April 3, 2018, Telos conducted a Psychiatric Evaluation, which listed five "diagnoses," including (i) unspecified anxiety disorder; (ii) unspecified depressive disorder; (iii) cannabis abuse; (iv) alcohol abuse; and (v) history of OCD.[40] On April 27, 2018, at approximately 1:30 AM, C.W. ran away for a second time, by approaching strangers to use their phones, convinced his friends to buy him a plane ticket to Los Angeles, and managed to get through airport security without any identification.[41] C.W. was found intoxicated and vomiting from alcohol and drug use, and was again re-admitted to Telos on May 16, 2018.[42]

An internal note by BSC, dated May 24, 2018, stated that—from Plaintiff's perspective— C.W. "has oppositionality and tends to think that he should be able to create his own rules and answer to nobody."[43] A psychiatric progress note, dated May 22, 2018, noted staff comments that C.W.'s engagement and motivation remained limited.[44] It further stated that C.W.'s "anxiety remains sensitive to stress – felt more in wilderness. Has had some ongoing increase in anxiety persisting."[45] On July 10, 2018, a psychiatric progress note indicated that C.W. "has been more motivated to work the program," his "general level of worry is 'slight' and situational," he is not "feeling down or depressed,"[46] he does not have any suicidal ideation, he struggles with "the impulse to talk," and he is "less clear of having ADHD but feels 'not enough to actually qualify

---

[39] Rec. 2600, 2909, 3095.
[40] Rec. 2732.
[41] Rec. 3178–79, 2600–01, 2699.
[42] *Id.*
[43] Rec. 2601, 2699.
[44] Rec. 2697.
[45] Rec. 2601, 2697.
[46] C.W. stated that "I can get sad but not really depressed." Rec. 2701.

for it.'"[47] On August 10, 2018, a psychiatric progress note stated that C.W. attributed his depression and anxiety to certain medications, has not felt depression "at all" since he stopped taking the medications, and still felt the emotions but "it's getting better with each day."[48] The note further stated that C.W. found "ongoing stress sensitivity that contributes to outrageous and mean behaviors."[49] On September 11, 2018, a psychiatric progress note stated that "multiple concerned parties involved with [C.W.]'s care . . . note ongoing stress sensitivity and easily overwhelmed nature he continues to demonstrate. . . . Denies feeling frankly depressed or down but does have difficulty sustaining motivation and engagement without being largely overwhelmed."[50]

Telos also kept daily residential charting notes for its patients.[51] These charting notes generally indicated, among other things, that C.W. was oppositional, disrespectful, used inappropriate language—including cursing and talking about sex and drugs—and was frustrated at times.[52] Of course, C.W. also had days where he behaved well.[53]

*First Denial of Benefits for Open Sky Treatment*

The court now turns to Plaintiff's claims processing interactions with BSC, who acted as the claims administrator.[54] In a letter dated September 10, 2018, BSC denied payment for C.W.'s treatment at Open Sky from February 16 through February 28, 2018.[55] The letter stated that BSC

---

[47] Rec. 2701.
[48] Rec. 2703.
[49] Rec. 2703.
[50] Rec. 2705.
[51] Rec. 2602, 2706–25.
[52] Rec. 2602–07.
[53] *See, e.g.*, Rec. 2711 (May 30, 2018: "student was really engaged in floor activities today and had almost no disruptive or inappropriate moments. All his interactions were really positive and student exhibited a great sense of humor"); Rec. 2715 (July 14, 2018: "[C.W.] had a very good day").
[54] Rec. 67–68.
[55] Rec. 338.

reviewed the information provided (including C.W.'s Open Sky medical records) and determined

that the treatment was not medically necessary under the MCG Guidelines.[56] In explaining the

rationale for the decision, the letter stated the following:

> Clinical information submitted does not substantiate the medical necessity for
> continued residential care. The records generally indicate that patient was
> cooperative, and not presenting any significant behavior problems that required
> the around-the-clock structure and management of a residential care facility.
>
> There was no behavioral evidence at the time that patient posed a risk to self or
> others. Patient's family appears to have been supportive and there were no
> indications that the home environment would have been unable to support
> patient's continued progress. There were no documented medical comorbidities or
> medication issues or significant changes in medications. There is no indication
> found that the member would experience a worsening of his condition in a less
> structured environment.[57]

*Plaintiff Appeals BSC's Denial of Coverage at Open Sky*

On January 29, 2019, Plaintiff submitted a level one appeal of the September 10, 2018

denial decision.[58] The appeal contained C.W.'s clinical information from Open Sky, as well as

various exhibits, including a letter from Michael S. Connolly, MD, dated January 2018, and a

letter of medical necessity from Jonathan Mitchell, MA, LPC, dated January 13, 2019.

Plaintiff argued that C.W.'s "intermediate outdoor behavioral health treatment was

medically necessary to treat his chronic ADHD, depression, and other high-risk behavioral

problems."[59] Additionally, Plaintiff argued that BSC appeared to improperly apply acute

requirements to subacute mental health treatment.[60] According to Plaintiff, this treatment also

---

[56] Rec. 338.
[57] Rec. 338.
[58] Rec. 313–586.
[59] Rec. 314–15. Plaintiff also includes a lengthy discussion of difficulties in the claim process that are not relevant to the medical necessity determination. Rec. 316–18.
[60] Rec. 318.

violates the Parity Act by imposing an impermissible nonquantitative treatment limitation.[61]

Plaintiff further argued that the RTC treatment must be comparable to treatment provided in

intermediate medical facilities, such as a skilled nursing facility.[62]

*Second Denial of Benefits for Open Sky Treatment*

In a letter dated March 7, 2019, BSC upheld its original decision to deny coverage of

C.W.'s stay at Open Sky from December 15, 2017 through March 28, 2018.[63] The denial letter

concluded that, after reviewing the information provided:

> care in a residential treatment program to treat your mental health problem
> (attention deficit hyperactivity disorder) was not medically necessary and your
> care could have safely been given in a program where you are only treated outside
> of the hospital three to five days per week in the daytime and spend your nights at
> home (Intensive Outpatient Psychiatric = IOP program)."

> The clinical rationale used in making this decision is:

> You were not a threat to yourself or others. You did not require 24-hour
> supervision and care. You were cooperative with your treatment. You were "with
> it" (alert and oriented) and had no major medical problems. It was not likely that
> care given only during the daytime (IOP) would increase your chance of getting
> worse (relapse)."[64]

The denial letter also referred to and attached a letter from a child and adolescent

psychiatrist who agreed with the denial decision.[65] The psychiatrist proceeded to summarize

certain background information from C.W.'s bio-psychological clinical interview, dated

December 19, 2017:

> According to the bio-psychological clinical interview (12/19/2017), substance
> abuse problems are present (cannabis). The patient exhibits signs of inattention
> and minimal signs of depression or mood issues. The patient had passive suicidal

---

[61] Rec. 320.
[62] Rec. 320–21.
[63] Rec. 727–28.
[64] Rec. 727–28.
[65] Rec. 728, 701–04.

thoughts without plan or attempt. The patient does not have active suicidal thoughts and is not currently suicidal. The patient is not experiencing anxiety. The patient is experiencing parent/child relational problems, including a hard time communicating with his parents. He often argues with his parents, often loses his temper with his parents, and is frequently angry with his parents. There are no signs of oppositional or disruptive behavior. There are no signs of mania, OCD, or PTSD.

According to the same report, bio-psychological clinical interview (12/19/2017), the therapist notes there is no danger to self or others, no risk of elopement, and there are no immediate safety concerns.[66]

The psychiatrist then walked through the MCG Guidelines and concluded that C.W.

failed to meet the criteria because:

- The patient was not a danger to self or others and a behavioral health disorder was not present or appropriate for residential care due to the requisite "serious dysfunction in daily living for child or adolescent" (not present)
- Recommended treatment is necessary, appropriate, and not feasible at lower level of care (not presented).[67]

*First Denial of Benefits for Telos Treatment*

In a letter dated June 1, 2018, BSC denied payment for C.W.'s treatment at Telos from

May 31, 2018 forward.[68] The letter stated that—applying the 2017 Magellan Care Guidelines as

adopted by Blue Shield's MHSA – Residential Behavioral Health, Child or Adolescent, B-902-

RES—BSC reviewed the information provided and concluded:

The patient does not appear to require supervision seven days per week/24 hours per day to develop skills necessary for daily living, to assist with planning and arranging access to a range of educational, therapeutic and aftercare services, and to develop the adaptive and functional behavior that will allow him or her to live outside of a residential setting and the patient's current living environment does not provide the support and access to therapeutic services needed. It appears that the member could be treated in a PHP setting. The information from your provider does not show that you require more intensive evaluation and treatment than you can get from a different level of care. Medical necessity criteria appear

---

[66] Rec. 701.
[67] Rec. 701–02.
[68] Rec. 2332–33.

to be met for behavioral health partial hospitalization treatment, which is available.[69]

*Plaintiff Appeals BSC's Denial of Coverage at Telos*

On January 14, 2022, Plaintiff appealed BSC's denial of coverage.[70] Plaintiff first provided C.W.'s behavioral background, followed by psychiatric progress notes and treatment notes from his stay at Telos. Based on this information, Plaintiff concluded that C.W.'s medical records showed that "he required the structured environment of residential treatment to prevent the impulsivity from taking center stage, to prevent him from targeting his peers, and to assist with his self-destructive behaviors."[71] Plaintiff argued that (i) BSC's denial rationale was contradictory based on BSC's internal notes (which stated that "[o]utside of 24-hour supervision, he will take off, steal money, use drugs, cross state lines and put himself in dangerous and risky situations"), (ii) BSC improperly used acute inpatient criteria to evaluate C.W.'s treatment, and (iii) BSC should have applied discharge criteria instead of admission criteria because BSC approved treatment from May 16 to May 30, 2018.[72] Plaintiff also alleged violations of the Parity Act based on BSC requiring individuals being treated in a sub-acute inpatient setting to satisfy the medical necessity criteria of an acute inpatient setting.[73]

*Second Denial of Benefits for Telos Treatment*

In a letter dated April 8, 2022, BSC upheld its original decision to deny coverage of C.W.'s stay at Telos from May 31, 2018 through March 15, 2019.[74] The letter stated that BSC

---

[69] Rec. 2332–33.
[70] Rec. 2595–3280. Plaintiff initially appealed on November 29, 2018 but sent its appeal to the wrong address. The court then remanded the case so that BSC could consider Plaintiff's appeal.
[71] Rec. 2597–2607.
[72] Rec. 2607–11, 1087.
[73] Rec. 2611–13.
[74] Rec. 3283–84; 3971–73, 3940–46.

reviewed the information provided and applied CALOCUS and the MCG guidelines in finding that the treatment was not medically necessary.[75] It reasoned:

> [Y]our care could be safely and effectively provided in outpatient care (where you are seen in a physician or counselor's office, once or twice a week as needed). The records indicate that there was never a significant risk that you would harm yourself or others. You were able to take care of normal daily activities (such as eating and bathing without supervision). You were generally getting along with others. You were having problems with your parents and avoiding school, which could have been safely and effectively treated in an office-based setting, where care could have included family therapy.[76]

The denial letter also attached and referenced conclusions by a Blue Shield, Board Certified Psychiatrist with experience in Adolescent Care, as well as an outside, independent Board-Certified Psychiatrist with expertise in Child and Adolescent Psychiatry—both of whom concluded that C.W. did not meet the medical necessity criteria for residential treatment level of care.[77]

The first attachment, written by Mathew Geromi, D.O.—whose title is "Medical Director," summarizes C.W.'s medical history at Open Sky and Telos.[78] Dr. Geromi then utilizes CALOCUS to obtain a score of 15, which correlates to outpatient treatment services as the recommended level of care.[79] Dr. Geromi also concluded that outpatient treatment would have been sufficient under the MCG Guidelines.[80] The second attachment, which lists a license number of the reviewer in place of a name, similarly summarizes C.W.'s medical history, utilizes

---

[75] Rec. 3283–84.
[76] Rec. 3284.
[77] Rec. 3284.
[78] Rec. 3940–41.
[79] Rec. 3940–41.
[80] Rec. 3941.

CALOCUS to obtain a score of 14 (corresponding with outpatient care), and concludes that outpatient treatment would also be sufficient under the MCG Guidelines.[81]

### Plaintiff Appeals BSC's Second Denial of Coverage at Telos

In a letter dated July 1, 2022, Plaintiff appealed BSC's second denial of coverage at Telos.[82] After summarizing the pertinent medical records, Plaintiff argued that "[I]t is clear from [C.W.]'s medical records from Telos that he required the structured environment of residential treatment to prevent his impulsivity from taking center stage, to prevent him from targeting his peers, and to assist with his self-destructive behaviors."[83] Plaintiff in large part repeated arguments from the prior appeal (including that BSC ignored certain records that favored RTC level of care), added several attachments—including letters of medical necessity from Mr. Mitchell and Barry Fell, LCSW, who was C.W.'s primary therapist at Telos—and included a chart comparing BSC's denial rationale with C.W.'s medical records.[84] Plaintiff also asserted that BSC violated the Parity Act by applying acute criteria to evaluate subacute inpatient residential treatment.[85]

### Third Denial of Benefits for Telos Treatment

In a letter dated August 30, 2022, BSC again upheld its original decision to deny coverage of C.W.'s stay at Telos from May 31, 2018 forward.[86] The letter stated that BSC reviewed the information provided, applied CALOCUS and the MCG guidelines, and provided

---

[81] Rec. 3943–48.
[82] Rec. 3354–3925.
[83] Rec. 3356–3365.
[84] Rec. 3366–86, 3999–4000, 4114.
[85] Rec. 3386–88.
[86] Rec. 4115-17, 4126–39.

the same reasoning as to why the treatment was not medically necessary.[87] The records were also

reviewed by the same two psychiatrists as in the prior denial letter.[88] In light of the updated

records, both reviewers adjusted their CALOCUS scores upwards to 16, which did not change

their ultimate determination that an outpatient level of care was appropriate.[89]

*Procedural Posture*

Plaintiff filed a Second Amended Complaint on February 17, 2023.[90] BSC filed its

Answer on August 4, 2023.[91] On August 2, 2024, the parties filed cross Motions for Summary

Judgment, which were fully briefed in September 2024.[92] Also on August 2, 2024, Plaintiff filed

a motion to exclude the expert report and opinions of Defendants' expert, Dr. Costello.[93]

## STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment must be granted "if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."[94] "Where, as here, the parties in an ERISA case both moved for

summary judgment . . . , summary judgment is merely a vehicle for deciding the case; the factual

---

[87] Rec. 4115–16.
[88] Rec. 4116.
[89] Rec. 4126–39.
[90] SAC.
[91] Answer, ECF No. 105.
[92] Defs.' MSJ; Pl.'s MSJ; Defs.' Opp'n to Pl.'s MSJ, ECF No. 131, filed on August 30, 2024 ("Defs.' Opp'n to Pl.'s MSJ"); Pl.'s Opp'n to Defs.' MSJ ("Pl.'s Opp'n to Defs.' MSJ"), ECF No. 133, filed on August 30, 2024; Defs.' Reply in Further Supp. of Their MSJ ("Defs.' MSJ Reply"), ECF No. 137, filed on September 13, 2024; Pl.'s Reply in Further Supp. of Its MSJ ("Pl.'s MSJ Reply"), ECF No. 136, filed on September 13, 2024.
[93] Pl.'s Mot. to Exclude Costello.
[94] Fed. R. Civ. P. 56(a).

determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[95]

## DISCUSSION

The parties move for summary judgment on Plaintiff's two claims: BSC's denial of benefits and an alleged MHPAEA violation. Plaintiff also moves to exclude the expert report and opinions of Dr. Costello as it relates to the purported MHPAEA violation. The court considers each in turn.

## I.    Denial of Benefits Claim

ERISA "sets minimum standards for employer-sponsored health plans[.]"[96] Congress enacted the regulations "to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits."[97] For this reason, "ERISA represents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans."[98] The court first addresses the proper standard of review.

### A.    Standard of Review

Under 29 U.S.C. § 1132(a)(1)(b), a civil action may be brought by an insurance plan participant to recover benefits under the terms of the plan. The Supreme Court has held that "a denial of benefits challenged under [ERISA] must be reviewed under a *de novo* standard unless

---

[95] *Carlile v. Reliance Standard Life Ins.*, 988 F.3d 1217, 1221 (10th Cir. 2021) (cleaned up) (quoting *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010)).
[96] *D.K. v. United Behav. Health*, 67 F.4th 1224, 1236 (10th Cir. 2023).
[97] *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830 (2003) (citation omitted).
[98] *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1145 (10th Cir. 2023) (internal quotation marks omitted) (quoting *Conkright v. Frommert*, 559 U.S. 506, 517 (2010)).

the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[99]

Where the plan administrator has discretionary authority, courts "employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious."[100] Defendants have the burden to demonstrate that the arbitrary and capricious standard applies.[101] Courts will uphold the administrator's determination "so long as it was made on a reasoned basis and supported by substantial evidence."[102] "Substantial evidence requires more than a scintilla but less than a preponderance."[103] Substantial evidence is "'such evidence that a reasonable mind might accept as adequate to support a conclusion reached by the decision-maker.'"[104]

"In determining whether the evidence in support of the administrator's decision is substantial, [courts] must take into account whatever in the record fairly detracts from its weight."[105] Plan administrators may not arbitrarily refuse to engage with a claimant's reliable evidence—including the opinions of a treating physician.[106] However, "a benefits decision can be reasonable even when the insurer receives evidence contrary to the evidence it relies upon."[107] For example, where an administrator "credits reliable evidence that conflicts with a treating physician's evaluation," courts may not require that plan administrators provide an explanation

---

[99] *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Foster v. PPG, Inc.*, 683 F.3d 1223, 1231 (10th Cir. 2012).
[100] *L.D. v. UnitedHealthcare Ins.*, 684 F. Supp. 3d 1177, 1195 (D. Utah July 28, 2023) (quoting *LaAsmar*, 605 F.3d at 796).
[101] *M.S. v. Premera Blue Cross*, 553 F. Supp. 3d 1000, 1019 (D. Utah 2021).
[102] *Van Steen v. Life Ins. Co. of N. Am.*, 878 F.3d 994, 997 (10th Cir. 2018).
[103] *Graham v. Hartford Life & Acc. Ins. Co.*, 589 F.3d 1345, 1358 (10th Cir. 2009).
[104] *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1308 (10th Cir. 2023) (quoting *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992).
[105] *David P.*, 77 F.4th at 1308.
[106] *Black & Decker*, 538 U.S. at 834.
[107] *David P.*, 77 F.4th at 1308.

as to why the administrator favored that evidence over the physician's evaluation.[108] However, an administrator also may not arbitrarily refuse to consider evidence that may confirm a beneficiary's theory of entitlement.[109] Thus, if a treating physician's evaluation confirms a claimant's theory of entitlement, an administrator may not arbitrarily refuse to "engage and address" such an evaluation.[110] "[R]eviewers cannot shut their eyes" to reliable evidence and ignore it.[111]

Arbitrary and capricious review considers whether the decision had a reasoned basis that is supported by substantial evidence.[112] This includes whether the decision is "consistent with any prior interpretations by the plan administrator, is reasonable in light of any external standards, and is consistent with the purposes of the plan."[113] "Consistent with the purposes of the plan requirements means that a plan administrator acts arbitrarily and capriciously if the administrator 'fails to consistently apply the terms of an ERISA plan' or provides 'an interpretation inconsistent with the plan's unambiguous language.'"[114]

The Plan affords BSC the discretion to interpret plan terms and determine coverage.[115] Therefore, the arbitrary and capricious standard of review applies.

---

[108] *Black & Decker*, 583 U.S. at 834. "This conclusion does not create any blanket requirement that a health plan administrator considering a claim for health care benefits must seek out all treating care givers' opinions found in a claimant's medical records and explain whether or not the plan administrator agrees with each of those opinions and why." *David P.*, 77 4th at 1312.
[109] *D.K.*, 67 F.4th at 1237 (quoting *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004)).
[110] *Id.* (citing *Black & Decker*, 583 U.S. at 834).
[111] *David P.*, 77 F.4th at 1310–11.
[112] *D.K.*, 67 F.4th at 1236.
[113] *Id.*
[114] *Id.* (quoting *Tracy O. v. Anthem Blue Cross & Life Health Ins.*, 807 Fed. Appx. 845, 854 (10th Cir. 2020).
[115] Rec. 67–68; *see also* Pl.'s MSJ 33 (conceding that the Plan has discretionary authority and arbitrary and capricious review applies).

**B.**    **ERISA's Claim Processing Requirements**

ERISA sets minimum requirements for employer-sponsored health plans, which may be administered by a third party.[116] "Administrators, like [BSC], are analogous to trustees of common-law trusts and their benefit determinations constitute fiduciary acts."[117] Thus, administrators owe a special duty of loyalty to plan beneficiaries in determining benefit eligibility.[118]

"ERISA promotes the interests of plan participants and beneficiaries and contractually defined benefits 'in part by regulating the manner in which plans process benefits claims.'"[119] These standards constitute the minimum requirements for a plan's claims-processing procedure.[120] The procedure, set forth in 29 U.S.C. § 1133 and in related implementing regulations, require "a meaningful dialogue between ERISA plan administrators and their beneficiaries."[121] When administrators issue denial letters, they need to explain in clear language the reason(s) for their decision.[122] The Tenth Circuit has held that "the administrator must include its reasons for denying coverage in the four corners of the denial letter" because denial letters "play a particular role in ensuring full and fair review."[123] The purposes of ERISA's claim processing requirements "are undermined where plan administrators have available sufficient information to assert a basis for denial of benefits but choose to hold that basis in reserve rather

---

[116] 29 U.S.C. § 1001; *D.K.*, 67 F.4th at 1236.
[117] *D.K.*, 67 F.4th at 1236.
[118] *Id.* (quoting *Metro. Life Ins. V. Glenn*, 554 U.S. 105, 111 (2008)).
[119] *David P.*, 77 F.4th at 1299 (quoting *Black & Decker*, 538 U.S. at 830).
[120] *Id.*
[121] *Id.* at 1300.
[122] *D.K.*, 67 F.4th at 1239 (quoting *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997)).
[123] *Ian C. v. UnitedHealthcare Ins. Co.*, 87 F.4th 1207, 1219 (10th Cir. 2023).

than communicate it to the beneficiary."[124] Thus, when an administrator holds in reserve a basis for providing benefits, the administrator prevents a full and meaningful dialogue.[125]

"[I]f the plan administrators believe that more information is needed to make a reasoned decision, they must [clearly] ask for it," explaining why the information is needed.[126] If they deny benefits based on the text of the plan, they must cite to the specific provisions of the plan.[127] And if plan administrators deny benefits based on their scientific or clinical judgment of the claimant's circumstances, they must explain their reasoning as applied to the terms of the plan.[128]

Relatedly, ERISA sets out minimum requirements for the appeals procedure for members to challenge initial denial decisions.[129] A plan's review procedures must "'afford a reasonable opportunity to any participant whose claim for benefits has been denied [to receive] a full and fair review . . . .'"[130] ERISA's "full and fair review" creates a procedure by which claimants receive letters "knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and . . . having the decision-maker consider the evidence presented by both parties to reaching and rendering [its] decision."[131] This includes providing claimants an "opportunity to submit written comments, documents, records, and other information relating to the claim for benefits" as well as conducting a "review that takes into

---

[124] *David P.*, 77 F.4th at 1313.
[125] *Id.*
[126] *Id.* at 1300.
[127] *David P.*, 77 F.4th at 1299 (citing 29 C.F.R. § 2560.503-1(g)(1)).
[128] *Id.*
[129] 29 U.S.C. § 1132(2).
[130] *D.K.*, 67 F.4th at 1236 (quoting 29 U.S.C. § 1133).
[131] *Id.* (quoting *Sage v. Automation, Inc. Pension Plan & Tr.*, 845 F.2d 885, 893–94 (10th Cir. 1988)).

account all . . . information submitted by the claimant relating to the claim."[132] "[A]dministrator statements may not be conclusory and any health conclusions must be backed up with reasoning and citations to the record."[133]

The court turns to Plaintiff's arguments regarding BSC's alleged improper denial of benefits in violation of ERISA. Plaintiff seeks the recovery of benefits from C.W.'s treatment at Open Sky from December 15, 2017 through March 28, 2018 and Telos from May 31, 2018 through March 15, 2019.

### C.    Plaintiff's Benefits Determination Arguments as to Open Sky

Plaintiff argues that BSC failed to engage in a meaningful dialogue in its Open Sky appeals process by ignoring a letter of medical necessity by Mr. Mitchell and the fact that outside a RTC, C.W. would likely slip back into drug and alcohol use, run away from home, refuse to attend outpatient treatment, and engage in other behaviors that would be threatening to himself and others.[134] Instead, according to Plaintiff, BSC's letters of denial were limited to conclusory statements without citation to the record.[135]

Contrary to Plaintiff's argument, BSC's March 7, 2019 denial letter, including the attached report, does acknowledge that "substance abuse problems are present (cannabis)."[136] It is of no consequence that the letter did not mention alcohol use, given that C.W. reported

---

[132] *David P.*, 77 F.4th at 1299 (quoting 29 C.F.R. § 2560.503-1(h)(2)(ii), (iv)).
[133] *D.K.*, 67 F.4th at 1242 (citing *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x 697, 705–06 (10th Cir. 2018) (unpublished)); *see David P.*, 77 F.4th at 1312.
[134] Pl.'s Mot. 35–36. Plaintiff also argued that BSC ignored her arguments, supported by a letter from Dr. Connolly, that BSC had utilized inappropriately acute symptom requirements to determine medical necessity. *Id.* As this primarily relates to Parity Act concerns, the court does not discuss this issue here.
[135] *Id.* at 38–39.
[136] Rec. 701.

infrequent alcohol use (five times in the past year),[137] Dr. Boas only lists cannabis (not alcohol) under "substance abuse problems,"[138] and there is no indication that C.W. received substance abuse disorder treatment at Open Sky.[139] Next, BSC's denial letters correctly did not mention C.W. running away, given that C.W. did not run away until he left Open Sky to attend Telos.[140] Further, the denial letter acknowledged that C.W. "had passive suicidal thoughts without plan or attempt" and "does not have active suicidal thoughts and is not currently suicidal."[141] This conclusion is consistent with C.W.'s medical records.[142]

Moving to Mr. Mitchell's letter of medical necessity, dated January 13, 2019, Mr. Mitchell states that he acted as C.W.'s therapist and oversaw his treatment as a "treatment team leader" during C.W.'s stay at Open Sky.[143] Mr. Mitchell opined:

> While [C.W.] made significant progress on treatment issues at Open Sky, it was my clinical assessment that his treatment issues were severe (e.g., significant-oppositional and defiant symptoms, severe entitlement, lack of emotional resilience, lack of coping-skills under stress), and necessitated continued residential treatment following Open Sky before returning home. For example, [C.W.] ran away from home once before enrolling at Open Sky, then ran away twice from his therapeutic school (Telos) before beginning to dedicate himself to the therapeutic process. I have been clinician for over 18 years and have rarely experienced someone so unwilling to accept working on treatment.

> Without the continued follow through of residential treatment, it is my professional opinion that [C.W.] would be at extremely high risk for relapsing into past behaviors that would be threatening to his and others' physical and

---

[137] Rec. 399.

[138] Rec. 438.

[139] Rec. 355–447; Defs.' Opp'n to Pl.'s MSJ 10.

[140] Rec. 2600–01, 2699, 2909, 3095, 3178–79.

[141] Rec. 701.

[142] *See* Rec. 440, 2701.

[143] Rec. 582. It is of no consequence that Mr. Mitchell is not a "treating physician," given that he was C.W.'s therapist during the relevant period. *See L.L. v. Anthem Blue Cross Life & Health Ins. Co.*, No. 2:22-cv-00208-DAK, 2024 WL 1937900, at *7 (D. Utah May 2, 2024) ("Plaintiffs are also permitted to produce evidence from non-treating physicians and individuals in the medical field and Defendants must grapple with these opinions, especially when they are contradictory.") (citing *Anne A. v. United Healthcare Ins. Co.*, No. 220CV00814JNPDAO, 2024 WL 1307168, at *8 (D. Utah Mar. 26, 2024)).

emotional wellbeing. Furthermore, is my professional opinion that [C.W.] returning and enrolling in a public school or home school setting with outpatient therapeutic support, will not provide the level of clinical treatment that [C.W.] requires, and will not be safe or prudent. Furthermore, it is my strong clinical opinion that [C.W.] remain in residential therapeutic care for the duration of his treatment program to continue to make consistent progress.[144]

BSC's March 7, 2019 denial letter, including the attached report, only specifically references C.W.'s psychological clinical interview, dated December 19, 2017, and C.W.'s treatment plan summary, effectively ignoring Mr. Mitchell's letter and C.W.'s Discharge Summary.[145] Moreover, its statements that "[y]ou were cooperative with your treatment"[146] and "[t]here are no signs of oppositional or disruptive behavior"[147] are conclusory and appear to conflict with parts of the record. For example, Mr. Mitchell's letter states that C.W. had "significant-oppositional and defiant symptoms" and over Mr. Mitchell's eighteen years as a clinician, has "rarely experienced someone so unwilling to accept working on treatment."[148] Mr. Mitchell further stated in C.W.'s Discharge Summary that C.W. "seemed to struggle to follow basic program expectations."[149] Furthermore, Dr. Boas stated in his January 16, 2018 Psychological Evaluation Report that C.W. was enrolled at Open Sky in part due to his oppositionality.[150] Other medical records state that C.W. appeared "to not be engaging in any way other than ways that will keep him from 'getting in trouble.'"[151]

---

[144] Rec. 582.
[145] Rec. 701–03, 727–28.
[146] Rec. 728.
[147] Rec. 701.
[148] Rec. 582.
[149] Rec. 427.
[150] Rec. 421.
[151] Rec. 355.

Additionally, the denial letter stated without explanation that it was not likely that outpatient care would increase C.W.'s chance of relapsing,[152] despite (i) Mr. Mitchell stating in his letter of medical necessity that C.W. "would be at extremely high risk for relapsing" outside of RTC care;[153] (ii) Dr. Boas stating in his January 16, 2018 Psychological Evaluation Report that "[a]t the present time, [C.W] lacks the emotional resources needed to return to his home environment . . .";[154] and C.W.'s Discharge Summary also recommended RTC treatment.[155]

BSC argues[156] that this case is comparable to *Tracy O. v. Anthem Blue Cross Life & Health Ins.*,[157] and *Mary D. v. Anthem Blue Cross Blue Shield*.[158] These cases are distinguishable. First, in *Tracy O.*, the Tenth Circuit upheld a denial of coverage where the treating clinicians "did not establish that [the beneficiary] met the prerequisites for residential treatment" because they did not offer an opinion that the beneficiary's "symptoms and behaviors represented a deterioration" or that her harmful behavior "could not be managed in an outpatient setting."[159] In contrast, both Mr. Mitchell and some record evidence provided support for the notion that C.W. was not cooperative with his treatment, was oppositional, and faced a risk of relapse outside of RTC care.

*Tracy O.* also cited to *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*[160] which is apposite. In *Rasenack*, the Tenth Circuit held that it was arbitrary and capricious for an administrator to

---

[152] Rec. 728; *see also* Rec. 702.
[153] Rec. 582.
[154] Rec. 423.
[155] Rec. 431.
[156] Defs.' Opp'n to Pl.'s MSJ 13.
[157] 807 F. App'x 845 (10th Cir. 2020).
[158] 778 F. App'x 580 (10th Cir. 2019).
[159] *Tracy O.*, 807 F. App'x at 855.
[160] 585 F.3d 1311 (10th Cir. 2009).

deny a claim on the ground there "is no evidence" the claimant suffered hemiplegia when in fact the claimant's treating physician submitted a letter concluding that the claimant suffered irreversible hemiplegia.[161] Similarly, BSC's statements that "[y]ou were cooperative with your treatment,"[162] "[t]here are no signs of oppositional or disruptive behavior,"[163] and there is minimal risk of relapsing[164] appear to reflect a lack of meaningful engagement with contrary record evidence.

Second, in *Mary D.*, the Tenth Circuit upheld a denial of coverage, despite treating medical providers recommending that the beneficiary obtain residential treatment after completing a current wilderness-therapy program.[165] The court explained that the administrator did not need to defer to the treating providers' opinions in the face of other credible medical evidence.[166] In addition, the court found that those opinions "don't necessarily contradict the conclusion that [the beneficiary] wasn't engaging in self-injurious or risk-taking behaviors when [the facility] admitted him."[167] As stated above, in this case, BSC's statements do appear to conflict with some record evidence, and BSC failed to cite relevant records in support of its contentions.

In short, BSC failed to grapple with the specific contradicting facts that could have justified awarding benefits. The beneficiary and the court are left with no way of discerning the degree to which BSC engaged with the record beyond a short summary of the Psychological

---

[161] *Id.* at 1325.
[162] Rec. 728.
[163] Rec. 701.
[164] Rec. 728; *see also* Rec. 702.
[165] *Mary D.*, 778 F. App'x at 593.
[166] *Id.*
[167] *Id.* at 594.

Evaluation Report attached to BSC's denial letter.[168] Of course, BSC did not have to defer to opinions in Mr. Mitchell's letter, the Psychological Evaluation Report, or the Discharge Summary, but it did have to engage with them. "[R]eviewers cannot shut their eyes" to reliable evidence and ignore it.[169] ERISA's procedural safeguards require "a meaningful dialogue between ERISA plan administrators and their beneficiaries."[170] Accordingly, because BSC failed to provide a "full and fair review" of C.W.'s record at Open Sky to provide Plaintiff with a "meaningful dialogue," BSC's denial of coverage for treatment at Open Sky was arbitrary and capricious.

### D.    Plaintiff's Benefits Determination Arguments as to Telos

As to Telos, Plaintiff similarly argues that BSC "ignored evidence and arguments submitted by Plaintiff, including letters of medical necessity and the conclusions of C.[W.]'s own treatment teams, in favor of conclusory denials.[171] First, Plaintiff takes issue with BSC's conclusion that C.W. did "not appear to require supervision seven days per week/24 hours per day," and that his residential treatment was not medically necessary in light of BSC's internal reviewer stating that "[o]utside of 24-hour supervision, [C.W.] will take off, steal money, use drugs, cross state lines and put himself in dangerous and risky situation[s]."[172] But BSC's reviewer specifically acknowledges C.W. running away on two occasions approximately one and two months prior to the coverage period in question.[173] Even the reviewer who made the above

---

[168] *See* Rec. 701.
[169] *David P.*, 77 F.4th at 1310–11.
[170] *David P.*, 77 F.4th at 1300.
[171] Pl.'s MSJ 40.
[172] Pl.'s MSJ 40.
[173] *See* Rec. 3940–42.

statement concluded that C.W. did not meet the necessary medical necessity criteria.[174] BSC

considered these facts and responded to them in making its medical necessity determination.

Second, Plaintiff argues that BSC made conclusory statements that "there was never a

significant risk that [C.W.] would harm [him]self or others."[175] Again, aside from running away

and using drugs during that period one and two months prior (which BSC discussed as described

above), BSC details that C.W. denied any suicidal or homicidal ideation, and had "no reports of

self-injurious behaviors, violence or harm to others," with the exception of once swinging "a

door with enough force that it put a hole in the wall."[176] Thus, the statement is not conclusory.

Third, Plaintiff argues that BSC violated ERISA by utilizing the same reviewers in its

second and third denial letters.[177] However, as BSC points out, ERISA's claims-processing

procedures prescribe standards for "[t]he claims procedures of a group health plan."[178] The Plan

only required a letter in response to Plaintiff's first appeal, but BSC consented to an additional

non-contractually obligated review as part of a negotiated remand process.[179] Thus, BSC was

under no legal or contractual obligation to utilize new reviewers when it consented to the second-

level review.[180]

Fourth, Plaintiff appears to take issue with BSC utilizing multiple sets of criteria in

concluding that treatment at a RTC was not medically necessary, including CALOCUS, two

versions of the MCG Guidelines, and "any nationally accepted behavioral health guidelines."[181]

---

[174] Rec. 1087.
[175] Pl.'s MSJ 41.
[176] Rec. 3940–42.
[177] Pl.'s MSJ 41.
[178] Defs.' MSJ Reply 12 (citing 29 C.F.R. § 2560.503-1(h)(3)).
[179] Defs.' MSJ Reply 12.
[180] Defs.' MSJ Reply 12–13.
[181] Pl.'s MSJ 41; *see also* Rec. 4133–37.

The denial letters make it plain that this was done to determine whether C.W. satisfied the medical necessity criteria under any of the guidelines.[182] The additional review could have inured to Plaintiff's benefit and was not problematic.

Lastly, Plaintiff argues that BSC's CALOCUS calculations were "baseless," particularly in light of C.W.'s medical records and letters of necessity.[183] The denial letters, which include BSC's CALOCUS calculations, acknowledge C.W.'s past attempts to run away,[184] some difficulties with interpersonal relationships with school, family, and peers,[185] substance use that impeded C.W.'s ability to function,[186] using drugs and alcohol with friends when he ran away,[187] having environmental support that is "occasionally disrupted" or inconsistent,[188] passive cooperation in treatment and intermittent behavioral issues,[189] and willing parental involvement.[190] Further, the denial letters provide a substantive overview of C.W.'s medical history.[191] In doing so, the denial letters adequately cite to C.W.'s medical records. Moreover, BSC's reviewers adjusted their CALOCUS calculations upwards to 16 based on the new information provided in Plaintiff's second-level appeal.[192] Plaintiff may disagree with BSC's calculations regarding C.W.'s Telos medical records, but that does not show that it abused its discretion. BSC sufficiently engaged in meaningful dialogue and provided substantial evidence in the Telos appeals process with respect to the medical records.

---

[182] Defs.' Opp'n to Pl.'s MSJ 15.
[183] Pl.'s MSJ 41–42.
[184] Rec. 3940–42.
[185] Rec. 4129, 4132.
[186] Rec. 4127, 4129.
[187] Rec. 3940, 4129–30.
[188] Rec. 4130.
[189] Rec. 4128, 4130–32.
[190] Rec. 4130.
[191] *See, e.g.*, Rec. 3940–42.
[192] Rec. 4127, 4134.

However, the same is not true regarding C.W.'s letters of medical necessity. The first letter of medical necessity, dated June 1, 2022, was authored by Barry Fell, a licensed clinical social worker and C.W.'s primary therapist at Telos.[193] The letter provides a CALOCUS score and opines that "[C.W.] needed a level 6 care facility - inpatient with 24 hour psychiatric care."[194]

The second letter of medical necessity, authored by Mr. Mitchell (who oversaw C.W.'s treatment at Open Sky) provided his description of CALOCUS criteria as applied to C.W. during his time at Open Sky:

- *Serious Risk of Harm* as demonstrated by repeated attempts of running away as a minor and travelling across numerous state lines.
- *Severe functional impairment* as demonstrated by his inability to navigate interpersonal relationships that require minimal accountability on his part in order to complete a positive interaction (e.g., completing assignments, chores, or tasks in his role as student or child).
- *Major co-occurrence of substances* that impeded his ability to function in his life and complete minimum role responsibilities (e.g., attend school, have conversations with parental figures and teachers, abide by minimum rules in the home).
- *Serious Environmental Stress* induced by the presence of unhealthy peer groups that facilitate the above mentioned maladaptive behaviors and choices.
- *No environmental support* as evidenced by the severely limited ability [C.W.]'s highly supportive parents and community assets are able to provide support to him. There were many people in [C.W.]'s life who would have been willing to support him, but he refused any and all support.
- *Negligible resiliency and response to services* as evidenced by [C.W.]'s adamant refusal to utilize any and all supports clearly communicated to him.
- *Absent involvement in services* as evidenced by above.
- *Optimal parent involvement in services* as evidenced by [C.W.]'s mother's highly engaged style of communicating and enrolling services to support [C.W.].[195]

---

[193] Rec. 4114.
[194] *Id.* The parties agree that Telos is not a level 6 facility. *See* Pl.'s MSJ 25 ¶ 79 (stating that level 5 care "corresponds with non-secure 24-hour medically monitored residential treatment services like those provided at Telos").
[195] Rec. 3999–4000.

Mr. Mitchell did not attempt to calculate a CALOCUS score, although he did recommend level 5 care.[196]

These letters of medical necessity by C.W.'s treating therapists arguably support C.W.'s theory of entitlement, and therefore BSC may not arbitrarily refuse to "engage and address" them.[197] ERISA's procedural safeguards require "a meaningful dialogue between ERISA plan administrators and their beneficiaries."[198] "[R]eviewers cannot shut their eyes" to reliable evidence and ignore it.[199] BSC's denial letters do not reference or discuss either of these letters. As such, the court and the beneficiary are left with no way of discerning whether BSC considered them. Of course, BSC did not have to defer to C.W.'s treating therapists' opinions, but it did need to engage with them. Accordingly, BSC's denial of coverage for treatment at Telos was arbitrary and capricious.

### E.    Remand for Further Consideration

Having determined that BSC acted arbitrarily and capriciously when it failed to comply with ERISA's claims processing requirements for C.W.'s treatment at Open Sky and Telos, the court would ordinarily decide whether to remand for the plan administrator's "renewed evaluation of the claimant's case" or to award benefits.[200] However, Plaintiff does not argue that the court should find that C.W. is entitled to benefits without a remand.[201] In any event, an award of benefits by the court is only appropriate when "the record clearly shows that the claimant is

---

[196] Rec. 4000.
[197] *D.K.*, 67 F.4th at 1237 (citing *Black & Decker*, 583 U.S. at 834).
[198] *David P.*, 77 F.4th at 1300.
[199] *Id.* at 1300–11.
[200] *Weber v. GE Grp. Life Assur. Co.*, 541 F.3d 1002, 1015 (10th Cir. 2008) (quoting *Flinders*, 491 F.3d at 1193).
[201] Pl.'s MSJ 48–49; Defs.' Opp'n to Pl.'s MSJ 29.

entitled to benefits."[202] Typically, "remand is appropriate if the administrator failed to make adequate factual findings or failed to adequately explain the grounds for the decision."[203] The court finds that remand is the appropriate remedy to consider Plaintiff's claims regarding coverage.

A remand, however, "does not provide the plan administrator the opportunity to reevaluate a claim based on a rationale not raised in the administrative record, and not previously conveyed to plaintiffs."[204] As to Open Sky, BSC must engage with Plaintiff's medical records and argument on appeal that contradict the notion that C.W. was cooperative with his treatment, did not express signs of oppositional or disruptive behavior, and was unlikely to relapse with outpatient treatment. Similarly, BSC is instructed to provide reasoned support for its conclusions regarding C.W.'s cooperation, oppositionality, and likelihood of relapse. If BSC concludes that any of its initial conclusions are not supported by the record, it should explain how that affects its ultimate benefits determination. As to Telos, BSC must engage with C.W.'s letters of medical necessity and address whether and how these letters affect its ultimate benefits determination.[205]

---

[202] *David P.*, 77 F.4th at 1315.
[203] *Id.* (cleaned up); *see id.* (citing *Spradley v. Owens-Illinois Hourly Emps. Welfare Ben. Plan*, 686 F.3d 1135, 1142 (10th Cir. 2012)) ("[R]emand is more appropriate where plan administrator failed to make adequate factual findings or failed to explain adequately the grounds for its decision to deny benefits, but not if the administrator instead gave reasons that were incorrect"); *Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 (1st Cir. 2005) (concluding remand as the proper remedy when the "problem is with the integrity of [the plan administrator]'s decision-making process").
[204] *David P.*, 77 F.4th at 1315.
[205] BSC also points out that "Plaintiff has failed to supply any claims or proof of payment for the Court to award benefits." Defs.' Opp'n to Pl.'s MSJ 20. The court need not consider this argument given that the court is not awarding benefits but instead remands the case to the parties for violation of ERISA's meaningful dialogue requirements.

## II.      MHPAEA (Parity Act) Claims

Plaintiff additionally claims that Defendants violated MHPAEA by applying acute requirements to subacute mental health treatment. Given that Defendants rely on Dr. Costello in disputing Plaintiff's purported MHPAEA violations, the court first considers whether her report and opinions are admissible under Federal Rule of Evidence 702.

### A.      Motion to Exclude Dr. Costello

#### 1.      Costello Report

In her expert report, Dr. Costello takes no position on whether the disputed services were "medically necessary."[206] Instead, she opines that utilization of the MCG Guidelines was "clinically appropriate for Blue Shield to consider" in its medical necessity evaluation.[207] Dr. Costello further opines that the MCG Guidelines do not focus solely, primarily, or improperly on acute symptomology, and that BSC's reliance on the guidelines do not show any clinically improper focus on acute symptomology.[208]

#### 2.      Rule 702 - Legal Standard

Under Federal Rule of Evidence 702, a witness may offer expert opinions if the witness is qualified "by knowledge, skill, experience, training, or education"; (a) the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence" or "determine a fact in issue"; (b) the expert's testimony "is based on sufficient facts or data" and (c) "is the product of reliable principles and methods"; and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."[209]

---

[206] Costello Report 3, 9.
[207] *Id.* at 3–7.
[208] *Id.* at 4, 8–9.
[209] Fed. R. Evid. 702.

Rule 702 "imposes a gatekeeping function on district courts to ensure expert testimony is admitted only if it is relevant and reliable."[210] In carrying out its gatekeeping role, the court employs a two-step analysis.[211] It first determines "whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion."[212] To satisfy this first step, the expert must "stay within the reasonable confines of his subject area and cannot render expert opinions on an entirely different field or discipline."[213] "[I]f the expert is sufficiently qualified, the court must determine whether the expert's opinion is reliable"[214] and "relevant to the task at hand[.]"[215]

District courts have discretion "to determine reliability in light of the particular facts and circumstances of the particular case."[216] When determining the reliability of an expert's opinions, district courts look at whether "the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of [the expert's] discipline'"[217] and "whether that reasoning or methodology properly can be applied to the facts at issue."[218] Though the Supreme Court has identified certain considerations bearing on reliability,[219] "the list is not exclusive, and district

---

[210] *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1217 (10th Cir. 2016) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).

[211] *Roe v. FCA US LLC*, 42 F.4th 1175, 1180 (10th Cir. 2022).

[212] *Nacchio*, 55 F.3d at 1241.

[213] *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991).

[214] *Nacchio*, 55 F.3d at 1241 (citing *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006)).

[215] *Obeslo v. Empower Cap. Mgmt., LLC*, 85 F.4th 991, 999 n.5 (10th Cir. 2023) (quoting *Daubert*, 509 U.S. at 597).

[216] *Kumho Tire*, 526 U.S. at 158; *see Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003); *Hollander*, 289 F.3d at 1205–06 (alteration in original).

[217] *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 883–84 (10th Cir. 2005) (quoting *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1120 (10th Cir. 2004), *order clarified on reh'g*, 400 F.3d 1227 (10th Cir. 2005)).

[218] *Daubert*, 509 U.S. at 593.

[219] *See Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1205 (10th Cir. 2002) ("The Supreme Court listed four nonexclusive factors that the trial court may consider in assessing reliability: (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.").

courts applying *Daubert* have broad discretion to consider a variety of other factors."[220]
"[C]ourts should generally 'focus on an expert's methodology rather than the conclusions it
generates.'"[221] A threshold showing of reliability does not mean the "expert's testimony is
'undisputably correct' or without uncertainty"; "potentially uncertain . . . evidence is properly
challenged at trial through cross examination or with competing evidence."[222] "Neither Rule 702
nor *Daubert* 'requires a district court to admit opinion evidence that is connected to existing data
only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an
analytical gap between the data and the opinion proffered.'"[223]

### 3.    *Analysis*

Plaintiff does not challenge Dr. Costello's qualifications.[224] And having reviewed them,
the court finds Dr. Costello qualified based on her training and experience.[225] Instead, Plaintiff
makes two principal arguments in favor of exclusion. First, Plaintiff argues that Dr. Costello's
report does not compare analogous guidelines (such as those of skilled nursing facilities with the
MCG Guidelines) and is thus unhelpful to the court's analysis.[226] Second, Plaintiff argues that

---

[220] *Goebel v. Denver & Rio Grande W. R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003) (citing *Kumho Tire*, 526 U.S. at 150).
[221] *Scis. v. Pediatric Hair Sols.*, No. 2:18-cv-00551, 2023 WL 6609378, at *3 (D. Utah Oct. 10, 2023) (quoting *Nacchio*, 555 F.3d at 1241).
[222] *Pehrson*, 65 F.4th at 540 (quoting *Bitler*, 400 F.3d at 1233); *see Goebel*, 346 F.3d at 991 ("While expert opinions 'must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation, . . . absolute certainty is not required.'" (alteration in original) (citation omitted)).
[223] *Etherton*, 829 F.3d at 1217–18 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).
[224] *See generally* Pl.'s Mot. to Exclude Costello.
[225] *See* Costello Report 2–3.
[226] Pl.'s Mot. to Exclude Costello 5–8.

Dr. Costello's report is unreliable because it ignores the language of the Plan and the relevant MCG Guidelines.[227] Both arguments fail.[228]

Starting with the former, Plaintiff's Parity Act claim is entirely based on her reading of the terms of the MCG Guidelines as requiring acute symptoms in contrast with treatment in a skilled nursing facility, which requires there be "no acute hospital care needs."[229] For example, in addition to a section heading to this effect,[230] Plaintiff's motion alleges:

> under the applicable guidelines, Defendants require symptoms that are "acute in nature" when determining the appropriateness of treatment in sub-acute residential treatment facilities, but explicitly cannot require such symptoms be present when determining the medical necessity of . . . skilled nursing services in a Skilled Nursing Facility. This disparity violates the Parity Act . . .[231]

Thus, demonstration that the MCG Guidelines do not require "acute" symptoms is sufficient to defeat Plaintiff's Parity Act argument. Dr. Costello's report is directly relevant to this point.[232]

As to Plaintiff's second argument, Plaintiff essentially argues that Dr. Costello's opinion is incorrect as to whether the MCG Guidelines improperly focus on acute symptomology, based on an alleged lack of "citation to any evidence" and in light of a footnote that mentions "acute" symptoms.[233] First, Dr. Costello does cite to the record—specifically the language of the

---

[227] *Id.* at 9–11.

[228] Plaintiff also argues that "[w]hile Dr. Costello takes "no position" on whether C.[W.]'s treatment was medically necessary, all her testimony speaks primarily to Plaintiff's claims for benefits under 29 U.S.C. §1132(a)(1)(B) rather than the claim for violations of the Parity Act." Pl.'s Mot. to Exclude Costello 7–8. The court did not consider Dr. Costello's report or declarations when evaluating the parties' medical necessity dispute. Therefore, the issue is irrelevant.

[229] Rec. 1776, 2309; Pl.'s MSJ 43–48.

[230] *See* Pl.'s MSJ 43 ("Defendants improperly relied on overly acute guideline criteria and symptoms to deny benefits in violation of the Parity Act.").

[231] Pl.'s MSJ 46; *see also id.* at 47 ("Defendants explicitly violate the terms of the Plan by requiring patients to exhibit acute symptoms.").

[232] *See* Defs.' Opp'n to Pl.'s Mot. to Exclude Costello 4–5.

[233] Pl.'s Mot. to Exclude Costello 9–11.

applicable guidelines she opines on.[234] Any interpretations of these guidelines, particularly as to whether they employ acute symptomology criteria, falls under her training and experience.[235] And it was not unreasonable for Dr. Costello to not specifically describe every footnote in her report that she did not believe would change her analysis, particularly when Plaintiff did not mention this footnote previously. A threshold showing of reliability does not mean the "expert's testimony is 'undisputably correct' or without uncertainty."[236]

Plaintiff also argues that discussion of this footnote in Dr. Costello's supplemental declaration[237] attached to Defendants' Opposition to Plaintiff's motion for summary judgment amounts to "untimely" expert testimony because the text of the footnote was available upon review of the MCG Guidelines.[238] The meaning attributed to the footnote falls within "the contested issue of whether Blue Shield improperly applied guidelines that were too restrictive or otherwise inappropriate," which Defendants disclosed Dr. Costello would testify regarding in their expert disclosures.[239] There was no indication prior to the summary judgment briefing that Plaintiff intended to argue that this single footnote altered the reasonable interpretation of the MCG Guidelines. Plaintiff also chose not to submit an expert report, a rebuttal expert report, or depose Dr. Costello.[240] Therefore, Dr. Costello's declaration was appropriate to rebut Plaintiff's new argument. Accordingly, the court finds Dr. Costello's report and opinions sufficiently

---

[234] *See* Costello Report 3–9.
[235] *See id.* at 2–3.
[236] *Pehrson*, 65 F.4th at 540 (quoting *Bitler*, 400 F.3d at 1233); *see Goebel*, 346 F.3d at 991 ("While expert opinions 'must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation, . . . absolute certainty is not required.'" (alteration in original) (citation omitted)).
[237] ECF No. 131-1, filed on August 30, 2024.
[238] Pl.'s MSJ Reply 22–24.
[239] Defs.' Resp. to Pl.'s Evid. Obj. 1, ECF No. 139, filed on September 20, 2024.
[240] Defs.' Opp'n to Pl.'s Mot. to Exclude Costello 5.

reliable for the court to consider regarding the language and meaning of the MCG Guidelines. Finally, as shown below, Dr. Costello's report and supplemental declaration do not change the result.

### B.    Whether Defendants Violated the Parity Act

The court next turns to the substance of Plaintiff's MHPAEA claim. "Congress enacted [MHPAEA] to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans."[241] A "comparison of treatment limitations under MHPAEA must be between mental health/substance abuse and medical/surgical care 'in the same classification.'"[242] For example, "if a plan or issuer classifies care in skilled nursing facilities or rehabilitation hospitals as inpatient benefits, then the plan or issuer must likewise treat any covered care in residential treatment facilities for mental health or substance user disorders as an inpatient benefit."[243] But the plans need not have identical coverage criteria so long as the application of nonquantitative treatment limitation to mental health or substance use disorder benefits in the classification are comparable to, and are applied no more stringently than, those used in applying the limitation with respect to medical/surgical benefits.[244]

Plaintiff argues that BSC places more restrictive limitations on benefits for mental health care compared to medical/surgical analogues, such as skilled nursing facilities.[245] Treatment in a

---

[241] *Michael D. v. Anthem Health Plans of Ky., Inc.*, 369 F. Supp. 3d 1159, 1174 (D. Utah 2019) (quoting *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016)).

[242] *Peter M. v. Aetna Health & Life Ins. Co.*, 554 F. Supp. 3d 1216, 1226–27 (D. Utah 2021) (quoting 29 C.F.R. § 2590.712(c)(4)(i), 2(ii)(A)).

[243] *Robert B. v. Premera Blue Cross*, 701 F. Supp. 3d 1153, 1182 (D. Utah 2023).

[244] *Id.* (citing 29 C.F.R. § 2590.712(c)(4)(i)).

[245] Pl.'s MSJ 43–44.

skilled nursing facility requires there be "no acute hospital care needs."[246] Plaintiff alleges that

the following bases for denying C.W. RTC coverage were acute symptoms that would have

warranted treatment in a more acute setting such as a psychiatric hospital:

- C.W. "was never a significant risk" to himself or others.
- He lacked "suicidal or homicidal ideations."
- He lacked "significant withdrawal symptoms."
- He lacked "symptoms suggestive of psychosis."
- He had "[n]o indication or report of physically or sexually aggressive impulses."[247]

However, simply because these symptoms (or lack thereof) were listed, does not mean

that C.W. was required to have these symptoms to be eligible for RTC care. Although the MCG

Guidelines do consider whether a patient is a danger to himself or others, a patient who does not

exhibit these symptoms can still qualify for RTC care if the patient exhibits a behavioral health

disorder with (i) moderately severe psychiatric, behavioral, or other comorbid conditions; or

(ii) a serious dysfunction in daily living.[248] Additionally, the "acute symptoms" listed to qualify

for inpatient treatment, on the other hand, are more restrictive, calling for "*imminent* danger" to

self or others or "*severe* psychiatric, behavioral, or other comorbid conditions" and "*severe*

dysfunction in daily living" and "*significant delirium*."[249] The court cannot conclude that taking

into account a patient's risk of harm[250] or allowing patients who exhibit a danger to self or

others—but not an imminent danger—to qualify for RTC treatment means acute symptoms are

required.

---

[246] Rec. 1776, 2309.
[247] Pl.'s MSJ 45.
[248] Rec. 2661.
[249] Rec. 319 (emphasis added).
[250] Plaintiff "does not dispute that it was clinically appropriate to 'assess the patient's degree of danger to himself or others' when evaluating a patient to determine the appropriateness of residential treatment." Pl.'s Mot. to Exclude Costello 6.

Plaintiff also points to a footnote in the MCG Guidelines, which according to Plaintiff, "*explicitly state[s]* that the '[s]ymptoms or conditions used' to determine the appropriateness of residential treatment 'are *acute in nature.*'"[251] Plaintiff argues that this footnote shows that BSC requires patients like C.W. "to display acute symptoms to qualify for sub-acute treatment."[252] Plaintiff, however, selectively quotes from this footnote.

The full footnote states, "Symptoms or conditions used in determining the appropriate treatment intensity should be due to the underlying behavioral health diagnosis or represent factors which are contributing to destabilization of the underlying diagnosis, and are acute in nature or represent a significant worsening over baseline."[253] As Dr. Costello explains, this footnote "discuss[es] potential changes in behavior that a clinician may conclude indicate a need for residential treatment. This may include, as the footnote[] explicitly state[s], a 'worsening' of the patient's mental health status 'over baseline.'"[254] Additionally, Dr. Costello opines that "clinicians consulting these guidelines to determine the appropriate level of care for an adolescent patient 'primarily refer to the guideline criteria and would not reasonably read these footnotes in isolation, much less only selective portions of the footnotes, to override the explicit terms of the guidelines.'"[255]

Dr. Costello's reading of the footnote is consistent with a plain reading of it. Plaintiff has elided critical substance from the footnote and its context. Acute symptoms may be relevant but are not required as a "significant worsening over baseline" is sufficient. Even Plaintiff's selective

---

[251] Pl.'s MSJ 46 (citing Rec. 2665) (emphases supplied).
[252] *Id.*
[253] Rec. 2665.
[254] Defs.' Opp'n to Pl.'s MSJ 26 (citing Supp. Costello Decl. ¶ 6).
[255] *Id.* at 27 (citing Supp. Costello Decl. ¶ 7).

quote from the footnote does not sufficiently support Plaintiff's interpretation to override the main text of the MCG Guidelines. Plaintiff bears the burden of proving a violation of the Parity Act but has failed to do so. This is the case whether all, some, or none of Dr. Costello's testimony is considered. Accordingly, the court denies Plaintiff's Parity Act claim.

## III.    WHETHER TRINET IS ENTITLED TO SUMMARY JUDGMENT

Finally, Defendants contend that at a minimum, Trinet is entitled to summary judgment because Plaintiff has presented no argument or evidence of wrongdoing by Trinet.[256] Plaintiff argues that because this is a self-funded plan, Trinet "is the party responsible for payment of benefits, and responsible for making participants and beneficiaries whole when their agent claims administrators act arbitrarily and capriciously to wrongfully deny benefits."[257] Defendants counter that Plaintiff only argues for a remand to BSC—which the court has granted as to C.W.'s treatment at Open Sky and Telos—not an award of benefits for which Trinet could be liable.[258]

It is true that Plaintiff did not request—and the court will not order—an award of benefits for which Trinet could be responsible at this time. Any liability attributable to Trinet could only arise in the future in the event that, on remand, either (i) BSC arbitrarily and capriciously determines that C.W. is not entitled to benefits for his treatment or (ii) BSC determines that C.W. is entitled to benefits, but Defendants refuse to pay. In either event, Plaintiff currently has no claim against Trinet. Therefore, summary judgment is granted to Trinet.

---

[256] Defs. MSJ 34–35.
[257] Pl.'s Opp'n to Defs.' MSJ 40.
[258] Defs.' MSJ Reply 18.

**ORDER**

Accordingly, the court GRANTS IN PART and DENIES IN PART the parties' motions for summary judgment. The court GRANTS Defendants' motion for summary judgment as to Trinet and Plaintiff's Parity Act claim, and otherwise DENIES their motion. The court GRANTS Plaintiff's motion for summary judgment for violating ERISA's meaningful dialogue requirement and REMANDS the benefits determination for C.W.'s treatment at Open Sky and Telos to BSC for further review consistent with this Memorandum Decision and Order. The court DENIES Plaintiff's motion to exclude the expert report and opinions of Dr. Costello and DENIES Plaintiff's Parity Act claim.

Signed February 10, 2025.

BY THE COURT

_____
David Barlow
United States District Judge